## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

**STEPHEN SPENCE, on behalf of himself and a class of all others similarly situated,**

       **Plaintiff,**

**v.**

**GC SERVICES LIMITED PARTNERSHIP, a Delaware limited partnership, and SHEILA M. FEWS, an individual,**

       **Defendants.**

**Case No.**

## NOTICE OF REMOVAL

Defendants GC Services Limited Partnership ("GC Services") and Sheila M. Fews ("Fews"), by and through the undersigned counsel, and pursuant to 28 U.S.C. §§ 1332(d) and 1446, hereby file this Notice of Removal, removing this action, Case No. 17462-CZ, Otsego County Circuit Court, State of Michigan, to the United States District Court for the Eastern District of Michigan. In support of this Notice of Removal, Defendants state as follows:

### PROCEDURAL BACKGROUND AND TIMELINESS OF REMOVAL

1. On October 9, 2018, Plaintiff Stephen Spence filed this action against GC Services and Fews in the Circuit Court of Ostego County, Michigan, Case No. 18-17462-CZ ("State Court Action"). A copy of the Complaint in the State Court Action, including the exhibits attached thereto, is attached hereto as Exhibit 1.

2. Plaintiff brings this action as a putative class action alleging two counts. Count I alleges that Defendants willfully violated the provisions of Section 339.915 of the Michigan Occupational Code by sending, on behalf of the State of Michigan, letters demanding payment of taxes and other Michigan State obligations. Plaintiff, on behalf of himself and the members of the

putative class, seeks against both Defendants damages or other equitable relief, attorney's fees, and costs. In Count II, Plaintiff alleges that he and the members of the putative class are third party beneficiaries of a contract between GC Services and the State of Michigan, under which GC Services provides collection services to the State of Michigan Department of Treasury. Plaintiff alleges that GC Services breached the provisions of the Contract and Plaintiff seeks actual damages on behalf of himself and the putative class against GC Services for the alleged breaches of contract, including damages for financial loss, lost time and opportunity, aggravation, and mental distress, as well as attorney's fees and costs.

3.      Plaintiff alleges that his damages exceed $25,000.00. Complaint, ¶ 11, Exhibit 1.

4.      Plaintiff seeks to represent a class of "all persons and entities who, in the six years prior to the filing of this complaint, have received one or more demand letters from Defendants ('the Class')." Complaint, ¶ 7, Exhibit 1.

5.      Fews was personally served with the Complaint on October 12, 2018. As of the date of this filing, Defendant GC Services has not been served with Plaintiff's Complaint, but is aware of the complaint through Fews' service. Additionally, Fews was served with Plaintiff's Motion for Entry of Preliminary Injunctive Order filed in the State Court Action on October 13, 2018 and GC Services obtained a copy from Fews. Copies of Plaintiff's Motion for Entry of Preliminary Injunctive Order, Brief in Support, Notice of Hearing, and Proof of Service of same are attached hereto as Exhibit 2.

6.      This Notice of Removal is being filed within thirty days of Defendants' receipt of Plaintiff's Complaint and, therefore, pursuant to 28 U.S.C. § 1446(b)(1), this Notice of Removal is timely.

7.      Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings, and orders served upon Fews and/or that GC Services received through Fews are attached hereto as Exhibit 1 (Complaint) and Exhibit 2 (Plaintiff's Motion for Entry of Preliminary Injunctive Order, Brief in Support, Notice of Hearing, and Proof of Service).

8.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiff and with the Clerk of the Otsego County Circuit Court.

9.      By removing this action to this Court, Defendants do not waive any defenses, objections, or motions available to it.  Defendants dispute Plaintiff's allegations, believes that Plaintiff's Complaint lacks merit, and denies that Plaintiff or the putative class have been harmed in any way. Defendants further dispute that the putative class is a proper class as defined, and reserves all rights and defenses related to class certification.

## BASIS FOR REMOVAL

10.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), which grants federal district courts original jurisdiction over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interests and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2).  As set forth below, this action satisfies each of the requirements of Section 1332(d)(2) for original jurisdiction under CAFA and is removable pursuant to 28 U.S.C. § 1441(a).

11.      Plaintiff's proposed class action meets CAFA's definition of "class action." Plaintiff's action was filed under Michigan's counterpart to Rule 23 of the Federal Rules of Civil Procedure, which authorizes an action to be brought by one or more representatives as a class action. *See* MCR 3.501; 28 U.S.C. § 1332(d)(1)(B); Plaintiff's Complaint, ¶¶ 5, 7, Exhibit 1.

12. Since 2012, GC Services has sent more than half a million letters similar to the letter attached to the Plaintiff's Complaint for new accounts (i.e., separate individuals or entities) placed with GC Services by the State of Michigan for collection. Thus, the putative class as pled in Plaintiff's complaint contemplates a class more than 100 members. 28 U.S.C. § 1332(d)(5)

13. The minimal diversity of citizenship required under CAFA is met because at least one member of the putative class is "a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). For example, Plaintiff alleges that he is a resident of Antrim County, Michigan. Complaint, ¶ 1. GC Services is a Delaware limited partnership with its principal place of business in Texas. *See* Complaint, ¶ 2. Pursuant to 28 U.S.C. § 1332(d)(1), GC Services is deemed to be a citizen of Delaware and Texas.

14. The amount in controversy exceeds CAFA's $5,000,000.00 threshold. A notice of removal "need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co. v. Owens,* 135 S. Ct. 547, 554 (2014). Plaintiff claims to have suffered in excess of $25,000.00 in damages, inclusive of fees and costs. With letters similar to those complained of by Plaintiff sent by GC Services to more than half a million potential class members, damages of $10.00 or less to each class member would exceed $5,000,000.00[1]. The claims of the putative class members are aggregated in determining the amount in controversy under CAFA. 28 U.S.C. § 1332(d)(6); *Standard Fire Ins. Co. v. Knowles,* 568 U.S. 588, 592 (2013). An additional consideration is that Plaintiff seeks injunctive relief, and the costs of complying with an injunction may establish the amount in controversy. *Cleveland Housing Renewal Project v. Deutsche Bank Trust Co.,* 621 F.3d 554 (6th Cir. 2010).

---

[1] Count I of the Complaint seeks relief under Mich. Comp. Law § 339.916(2), which provides for actual damages or $50.00, whichever is greater. Complaint ¶ 13 to 36.

15.     Pursuant to 28 U.S.C. §1441(a) and 28 U.S.C. §1446(a), venue for this action is proper in this Court.  The State Court action is pending in the district and division embracing this Court.

WHEREFORE, Defendant GC Services Limited Partnership hereby gives notice of the removal of this action from the Circuit Court of Ostego County, Michigan, to the United States District Court for the Eastern District of Michigan.

Respectfully submitted,

/s/ Marcus R. Sanborn
Marcus R. Sanborn (P69565)
BLEVINS SANBORN JEZDIMIR ZACK PLC
1842 Michigan Avenue
Detroit, MI 48216
P & F: (313) 338-9500
Email:  msanborn@bsjzlaw.com

**ATTORNEY FOR DEFENDANT,
GC SERVICES LIMITED PARTNERSHIP**

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2018, I caused to be sent via first class mail the

foregoing Notice of Removal to the following:

Lawrence A. Friedman
Post Office Box 609
Grayling, MI 49738
Email: lfriendman@friendmanpartners.net

-and-

WM Paul Slough
145 North Otsego Avenue
Gaylord, MI 49735
Email: paul@gaylordlaw.com

**ATTORNEYS FOR PLAINTIFF**

*/s/ Marcus R. Sanborn*



STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OTSEGO

STEPHEN SPENCE, on behalf of
himself and a class of all others
similarly situated,

                 Plaintiffs,

vs

GC SERVICES LIMITED PARTNERSHIP,
A Delaware limited partnership

and

SHEILA M. FEWS, an individual,

                 Defendants.

_____/

File No: 18- )7462 -CZ

Hon.

**Colin G. Hunter**
**P-71821**

**TRUE COPY**
OCT 09 2018
OTSEGO COUNTY CLERK

LAWRENCE A. FRIEDMAN    (P36935)
Attorney for Plaintiff
Post Office Box 609
Grayling, MI 49738
317-501-4671
*lfriedman@friedmanpartners.net*

WM PAUL SLOUGH    (P70489)
Co-Counsel for Plaintiff
145 North Otsego Avenue
Gaylord, MI 49735
989-732-2912
*paul@gaylordlaw.com*

_____/

## CLASS ACTION COMPLAINT

There is no other civil action between these parties arising
out of the same transaction or occurrence as alleged in
the complaint pending in this court nor has any such
action been previously filed and dismissed or transferred
after having been assigned to a judge.

1

**NOW COMES** the above-named Plaintiff, by and through his attorneys, Kirkpatrick & DuBois, and for his Complaint against the above-named Defendants, state as follows:

## Jurisdiction and Venue

1. Plaintiff Stephen Spence is a resident of Antrim County, Michigan, and brings this action on behalf of himself and all others similarly situated throughout the State of Michigan.

2. Defendant GC Services Limited Partnership ("GC Services") is a limited Delaware partnership who regularly conducts business throughout the State of Michigan, including Otsego County, with a primary office at 6330 Gulfton, Houston, TX 77081, and resident agent The Corporation Company, 30600 Telegraph Road, Bingham Farms, MI 48025.

3. Defendant Sheila M. Fews is an individual who resides in Lansing, Michigan, and is licensed under Article 9 of the Michigan Occupational Code and who conducts business in Ingham County, Michigan, Agency License No. 2401002937, Manager License No. 2402001187.

4. GC Services independently contracts with the State of Michigan to collect over 300 types of delinquent tax and state agency obligations including, but not limited to, sales, use and withholding taxes, individual income taxes, driver responsibility fees, welfare overpayments, and district court costs, fines and fees ("the Contract"). In FY 2017 alone, GC Services collected nearly $170 million in Tax and Non Tax obligations and was paid nearly $30 million in commissions.

5. This lawsuit is a proposed class action against Defendants for violations of Article 9 of the Michigan Occupational Code, MCL 339.901 *et seq,* ( "Article 9"), and for breach of the Contract as a third-party beneficiary, which requires GC Services to maintain compliance with the Fair Debt Collection Practice Act, 15 USC § 1601, *et seq* ("FDCPA").

6.  Defendants have sent letters, statements, and other correspondence to persons and entities demanding payment on obligations ostensibly owed to the State of Michigan (the "demand letters").

7.  Plaintiff seeks to represent all persons and entities who, in the six years prior to the filing of this complaint, have received one or more demand letters from Defendants ("the Class").

8.  As set forth in this complaint, Defendants' demand letters sent to the Class violate Article 9 by using printed forms of a government agency or instrumentality, and by operating under a name or in a manner that implies or states that Defendants are a branch of, or associated with, or has been approved or licensed by, the Michigan Department of Treasury.

9.  As further set forth in this complaint, GC Services has breached the Contract with the content of its demand letters and with GC Services' other conduct, and members of the Class, as third-party beneficiaries of the Contract, have suffered damage as a direct and proximate result of GC Services' breach.

10. Plaintiff is a sole proprietor who received one of Defendants' demand letters, and is a member of the Class. *Exhibit 1 – Sample Demand Letter dated February 20, 2018.*

11. Plaintiff seeks damages, inclusive of attorney fees and costs, in an amount exceeding $25,000.00.

12. Jurisdiction and venue are proper in this court.

### Count I – Violation of Article 9 of the Michigan Occupational Code

13. Plaintiff incorporates all the preceding paragraphs by reference.

14. In its demand letters, GC Services describes itself as "a private debt collection company... authorized to collect delinquent liabilities owed to the state." *Exhibit 1.*

15. Under Article 9, a "collection agency" is an individual who, in the course of collecting or attempting to collect, represents himself or herself as a collection agency.

16. GC Services is licensed "collection agency" under Article 9, holding multiple Michigan licenses, including one by non-owner manager Defendant Sheila M. Fews in Ingham County, Michigan, Agency License No. 2401002937, Manager License No. 2402001187.

17. GC Services' contract with the State of Michigan requires it to maintain an office in Ingham County, Michigan, and to be properly licensed under Article 9.

18. For these reasons, each Defendant is a "collection agency" under Article 9.

19. Further, each Defendant is a "licensee" as that term is used in Article 9.

20. Article 9 defines a "claim" and "debt" to mean an obligation made primarily for personal, family, or household purposes. A "debtor" is defined as an individual who owes or purportedly owes a claim or debt.

21. Most prohibited acts under Article 9 apply only to a "claim" or "debt," or apply only to communications with "debtors." This makes many protections under Article 9 unavailable to the Class, as obligations owed to the State of Michigan are not typically for personal, family, or household purposes.

22. However, Article 9 contains blanket prohibition against certain activities regardless of whether the activity is related to obligations made primarily for personal, family, or household obligation.

23. Specifically, as a licensed private collection agency under Article 9, each Defendant is prohibited from:

    a. Using printed forms of a government agency or instrumentality. MCL 339.915(c).

b.      Operating under a name or in a manner that implies or states that the collection agency is a branch of, or associated with, or has been approved or licensed by, a department of federal, state, or local government.  339.915a(p).

24.    Neither of these prohibitions are limited to the collection of a "claim" or "debt" and apply generally to all licensees under the plain language of the statute.

25.    As part of Defendants' demand letters, Defendants enclose a Liability Information Statement containing a payment voucher in the footer area.  The payment voucher is an official printed Michigan Department of Treasury Form No. 3480.

26.    Defendants' use of the Michigan Department of Treasury form, even if done so with the implied or express permission of the Michigan Department of Treasury, is a violation of MCL 339.915(c), which broadly prohibits the use of any printed forms of a government agency by a licensee.

27.    The Michigan Department of Treasury cannot authorize Defendants to violate MCL 339.915(c).

28.    Further, Defendants are operating under a name or in a manner that implies or states that GC Services is a branch of, or associated with, or has been approved or licensed by, the Michigan Department of Treasury, specifically:

a.      Designating itself as the "Michigan Accounts Receivable Collection System";

b.      Referring to itself as the "Office of Collections";

c.      Using an official State of Michigan website link in the footer of its demand letters;

d.      Attaching an official Michigan Department of Treasury form to its demand letters;

e.      Stating that its agents are "representatives of the Michigan Department of Treasury and authorized to collect delinquent liabilities owed to the state."

f.      Displaying its address and phone number next to official Michigan Department of Treasury website addresses and forms.

29. Defendants' act of operating in this manner, even if done so with the implied or express permission of the Michigan Department of Treasury, is a violation of MCL 339.915a(1)(p), which broadly prohibits this activity by a licensee.

30. The Michigan Department of Treasury cannot authorize Defendant to violate MCL 339.915a(1)(p).

31. The Michigan Legislature's restrictions on licensees in Article 9, as set forth above, are intended to prevent confusion and to protect the integrity of local, state, and federal collections.

32. Defendants' violations cause significant confusion in the Class; for example, an individual receiving one of Defendants' demand letters is provided a telephone number directly to Defendants' private collection agent, not to a civil servant of the State of Michigan.

33. An individual receiving one of Defendants' demand letters is left with the impression that a payment issued as directed is being sent directly to the State of Michigan, when it is in fact being sent to GC Services, a private collection agency.

34. Defendants have violated MCL 339.915(c) and MCL 339.915a(1)(p) by sending demand letters to members of the Class as set forth above.

35. Defendants' violation was willful.

36. Each person of the Class who suffers injury, loss, or damage, or from whom money was collect by the use of a method, act, or practice in violation of Article 9 may bring an action for damages or other equitable relief.

**WHEREFORE,** Plaintiff requests that this court enter an order certifying the Class, finding that Defendants' acts willfully violate MCL 339.915(c) and MCL 339.915a(1)(p), and awarding each member of the Class damages, together with reasonable attorney fees and court costs.

## Count II – Breach of Contract

37. Plaintiff incorporates all the preceding paragraphs by reference.

38. GC Services provides collection services to the State of Michigan Department of Treasury under the Contract, in which GC Services makes express promises to the State of Michigan to collect monies and maintain specific standards. *Exhibit 2 – Statement of Work Terms and Conditions.*

39. In the Contract, GC Services promises to "utilize a fair, consistent collection process that maintains compliance with the State and Federal Fair Debt Collection Practice Acts." *Exhibit 2 at 1.022(2)(f).*

40. Additionally, GC Services promises the State of Michigan in the Contract that it will:

    a. provide its personnel with "extensive training regarding the Fair Debt Collection Practices Act and the Consumer Credit Protection Act during new hire and ongoing training."

    b. ensure every employee passes an FDCPA test with a score of 100% on a semi-annual basis; and

    c. "full compliance" of its employees and that it will hold monthly prevention meetings specific to the FDCPA.

41. In sum, GC Services promises in the Contract that it will implement and adhere to FDCPA standards in collecting debts from members of the Class.

42. The elevated FDCPA standards imposed on GC Services in its collection practices through the Contract was directly intended to benefit members of the Class; that is, GC Services has contractually undertaken to give or to do or refrain from doing something directly to or for said members of the Class.

43. For this reason, members of the Class, including Plaintiff, are third-party beneficiaries of the Contract under MCL 600.1405 and Michigan common law.

44.   GC Services has breached the Contract by failing to comply with FDCPA standards, including but not limited to:

a.   Failing to disclose in the initial written communication to members of the Class that the initial communication from GC Services is attempt to collect a debt and that any information obtained will be used for that purpose;

b.   Using language or symbol, other than the debt collector's address, on any envelope when communicating with a Class member by use of the mails;

c.   Using the business, company, or organization name other than the true name of the GC Services' business, company, or organization;

d.   Failing to include in the demand letter a statement that if the Class member notifies the debt collector in writing within a thirty-day period that the debt, or any portion thereof, is disputed, GC Services will obtain verification of the debt or a copy of such verification will be mailed to the Class member;

e.   Failing to actually stop collection and verify debts when verification of the debt was demanded by a members of the Class.

45.   Plaintiff, through his counsel, did demand from GC Services verification of an obligation ostensibly owed to the State of Michigan, to which GC Services refused to stop collection and provide written verification.

46.   As a direct result of GC Services' breaches of the Contract, members of the Class have suffered actual damages including but not limited to financial loss, lost time and opportunity, aggravation, and mental distress.


**WHEREFORE,** Plaintiff requests that this court enter an order certifying the Class; finding that members of the Class are third-party beneficiaries of the Contract under MCL 600.1405 and the common law; holding that the GC Services has breached the contract; and awarding each member of the Class damages arising from the breach; and award the members of the Class reasonable attorney fees and court costs.

8

Dated: 10/8/2016

WM PAUL SLOUGH                    (P70489)
Co-Counsel for Plaintiff
KIRKPATRICK DuBOIS & SLOUGH PLC
145 North Otsego Avenue
Gaylord, MI 49735
989-732-2912    paul@gaylordlaw.com

**EXHIBIT 1**

# MICHIGAN ACCOUNTS RECEIVABLE COLLECTION SYSTEM

SPENCE STEPHEN E
YUKON SAMS TRADING POST
10196 SOUTHWOOD DR
MANCELONA MI 49659-8995

Date: February 20, 2018
Account No: FTR1955846
Contact Telephone Number:
866-754-8649

| Balance Due Immediately | $1,854.75 |
|---|---|

You have previously received a letter from the Michigan Department of Treasury requesting resolution of your outstanding balance. You failed to respond, which has resulted in your account being referred to the Michigan Accounts Receivable Collection System (MARCS), operated on behalf of the State of Michigan by GC Services Limited Partnership, a private debt collection company. GC Services Limited Partnership employees at the MARCS site are representatives of the Michigan Department of Treasury and are authorized to collect delinquent liabilities owed to the State.

By paying the "Balance Due Immediately" within 10 days of this letter, you will avoid:
- Enforcement action such as a levy against wages, bank accounts, or other financial assets for the State of Michigan tax balance. Expenses incurred in collection of this liability will be charged to you.
- Money payable to you from the State of Michigan being withheld and applied to your State debt.
- Money payable to you from the City being withheld and applied to your City debt.

In addition, while a State tax balance remains outstanding, you are subject to a lien being filed against your real or personal property. Once filed, the lien(s) will remain open until the balance is resolved. Penalty and interest will continue to accrue as provided by statute.

We offer the following payment options:
- Visit **www.michigan.gov/collectionseservice** to view account information and pay using a checking account, savings account, or credit card.
- Pay over phone using a checking or savings account by calling the number listed above.
- Pay by mail using the attached payment voucher and return envelope.

    *Note – Credit cards are only accepted on the web and cannot be used over the phone.

This is an attempt to collect amounts due to the State and any information obtained will be used by GC Services Limited Partnership, only for that purpose. If this liability has been paid within the last 30 days and the balance due does not reflect that payment, contact the telephone number above to discuss the account with a representative.

Enclosures:
        Liability Information Statement
        Envelope

SPENCE STEPHEN E
LIABILITY INFORMATION - PAGE 1

Date: February 20, 2018
Account No: FTR1955846

| PERIOD END REFERRAL DATE | ASSESSMENT NUMBER | TYPE OF DEBT | ASSESSED BALANCE | PRIMARY ACCOUNT NUM |
|---|---|---|---|---|

**Balance Due Now (MAY BE SUBJECT TO ENFORCEMENT ACTION)**

| PERIOD END REFERRAL DATE | ASSESSMENT NUMBER | TYPE OF DEBT | ASSESSED BALANCE | PRIMARY ACCOUNT NUM |
|---|---|---|---|---|
| 12/16 | UY66510 | MICHIGAN SALES TAX | $1,854.75 | FTR1955846 |
| Sub-Total | | | $1,854.75 | |

**Balance Within Appeals Period (NOT CURRENTLY SUBJECT TO ENFORCEMENT ACTION)**

| | | | | |
|---|---|---|---|---|
| Sub-Total | | | $0.00 | |

| | | | | |
|---|---|---|---|---|
| Total | | | $1,854.75 | |

*This statement does not include any debt not subject to collections as of the date of this letter

Detach and mail the Payment Voucher with your payment
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Michigan Department of Treasury
3480 (Rev. 6/13)

**Payment Voucher**

Make your check payable to "State of Michigan-OC." Write your Account No./Social Security No. and Assessment No. on all checks and Correspondence. Allow up to 14 days for processing. A return envelope is Enclosed for your convenience.   **Mail payment and this voucher to:**

**Michigan Department of Treasury**
**Dept. 77437**
**P O BOX 77000**
**Detroit, Michigan 48277-0437**

| Account Number FTR1955846 | Date Issued February 20, 2018 |
|---|---|
| Total Amount Due $1,854.75 | Enter Social Security Number |
| Write Payment Amount Here  ☞  $ | |

Notify the Office of Collections in writing if your address is incorrect.

▼  **DO NOT WRITE IN THIS SPACE**  ▼

000001854753  999988883  000000000009  500195584606  4

**EXHIBIT 2**



## DEFINITIONS

**24x7x365** means 24 hours a day, seven days a week, and 365 days a year (including the 366th day in a leap year).

**ACH** means Automated Clearing House, a nationwide electronic funds transfer system that provides for inter-bank clearing of electronic payments.

**Additional Service** means any Services within the scope of the Contract, but not specifically provided under any Statement of Work.

**Audit Period** means the seven year period following Contractor's provision of any work under the Contract.

**Baseline Software** means the MARCS software package as it exists at the beginning of the Contract.

**BCP** means Bankruptcy Claims Professional, a software package used for processing bankruptcy petitions and claims.

**Bidder(s)** are those companies that submit a proposal in response to this Contract.

**Bill for Final Taxes Due (also known as Final Assessment)** is a notice sent to a taxpayer who does not pay tax due, present correcting information, or request an informal conference within 60 days after receiving the Notice of Intent to Assess.

**Billing and Collections Process** is the process that takes place when a taxpayer has unpaid debt. The process includes four steps; the Initial Efforts to Collect the Debt, Referral to the Collection Division, Final Billing, and Escalated Collection Activity.

**Business Day** means any day other than a Saturday, Sunday or State-recognized legal holiday from 8:00am EST through 5:00pm EST unless otherwise stated.

**Blanket Purchase Order** is an alternate term for Contract and is used in the Plan Sponsors' computer system.

**CACS-G** means Computer Assisted Collection System for Government.

**CBT** means Computer Based Training.

**CCI** means Contract Compliance Inspector.

**CEPAS** means Centralized Electronic Payment Authorization System, a centralized electronic method for processing payment for the State of Michigan.

**COBIT** means Control Objectives for Information and related Technology.

**Days** means calendar days unless otherwise specified.

**Deleted – N/A** means that section is not applicable or included in this Contract. This is used as a placeholder to maintain consistent numbering.

**Deliverable** means physical goods and/or services required or identified in a Statement of Work.

**DMB** means the Michigan Department of Management and Budget.

**Enterprise Solution Assessment** means a study done to determine if a proposed change to an interface meets the State's security standards.
**Environmentally Preferable Products** means a product or service that has a lesser or reduced effect on human health and the environment when compared with competing products or services that serve the same purpose. Such products or services may include, but are not limited to: those which contain recycled content, minimize waste, conserve energy or water, and reduce the amount of toxics either disposed of or consumed.

**Final Billing** is a notice sent to a taxpayer who fails to resolve the tax debt or request an informal conference within 60 days of the date of the Notice of Intent to Assess. The Collection Division sends a Bill for Final Taxes Due (Final Assessment) to the taxpayer. In some instances assessments do not go through the first two steps, but are issued directly as final billings.

**Final Demand Letter** is a notice which expressly states a debt is due and payable either immediately or within a specified time period. The notice must be sent 10 days prior to seizing assets through levy or warrant action.

**GAL** means Garnishment and Levy system.

**Hazardous Material** means any material defined as hazardous under the latest version of federal Emergency Planning and Community Right-to-Know Act of 1986 (including revisions adopted during the term of the Contract).

**Incident** means any interruption in any function performed for the benefit of a Plan Sponsor.

**IVR** means Interactive Voice Response.

**Key Personnel** means any personnel identified in Section 1.031 as Key Personnel.

**Letter of Inquiry** is a notice sent to a taxpayer stating the reason tax may be owed and requests the taxpayer provide information supporting a return as filed by the taxpayer.

**MARCS** means Michigan Accounts Receivable Collection System.

**MDIT** means Michigan Department of Information Technology.

**New Work** means any Services/Deliverables outside the scope of the Contract and not specifically provided under any Statement of Work, such that once added will result in the need to provide the Contractor with additional consideration. "New Work" does not include Additional Service

**NIST** means National Institute of Standards and Technology.

**Notice of Intent to Assess** is a notice sent to a taxpayer indicating amount of tax owed, reason for deficiency, and advises of the right to dispute tax owed by requesting an informal conference.

**Ozone-depleting Substance** means any substance the Environmental Protection Agency designates in 40 CFR part 82 as: (1) Class I, including, but not limited to, chlorofluorocarbons, halons, carbon tetrachloride, and methyl chloroform; or (2) Class II, including, but not limited to, hydro chlorofluorocarbons.

**Post-Consumer Waste** means any product generated by a business or consumer which has served its intended end use; and which has been separated or diverted from solid waste for the purpose of recycling into a usable commodity or product, and which does not include post-industrial waste.

**Post-Industrial Waste** means industrial by-products which would otherwise go to disposal and wastes generated after completion of a manufacturing process, but do not include internally generated scrap commonly returned to industrial or manufacturing processes.

**Predictive Dialer** means an auto dialer software program that will transfer an automated phone call to an operator or agent when the call is answered by a live person.

**Recycling** means the series of activities by which materials that are no longer useful to the generator are collected, sorted, processed, and converted into raw materials and used in the production of new products. This definition excludes the use of these materials as a fuel substitute or for energy production.

**Reuse** means using a product or component of municipal solid waste in its original form more than once.

**SAP** means Systems Applications and Products (software package).

**Services** means any function performed for the benefit of the State.


**SLA** means Service Level Agreement.

**Source Reduction** means any practice that reduces the amount of any hazardous substance, pollutant, or contaminant entering any waste stream or otherwise released into the environment prior to recycling, energy recovery, treatment, or disposal.

**STAR** means State Treasury Accounts Receivable, the State's current accounts receivable system.

**State Location** means any physical location where the State performs work. State Location may include state-owned, leased, or rented space.

**SUITE** means State Unified Information Technology Environment. It is a standardized methodology for project and systems development based on standardized and repeatable practices.

**Subcontractor** means a company selected by the Contractor to perform a portion of the Services, but does not include independent Contractors engaged by Contractor solely in a staff augmentation role.

**SEM** means Systems Engineering Methodology.

**Taxpayer Bill of Rights** is a handbook written as part of the provisions of Public Act 13 and 14 of 1993 to explain State employee responses to the public, standards for tax audit activities, and to help taxpayers understand their rights and responsibilities.

**Unauthorized Removal** means the Contractor's removal of Key Personnel without the prior written consent of the State.

**Waste Prevention** means source reduction and reuse, but not recycling

**Pollution Prevention** means the practice of minimizing the generation of waste at the source and, when wastes cannot be prevented, utilizing environmentally sound on-site or off-site reuse and recycling. The term includes equipment or technology modifications, process or procedure modifications, product reformulation or redesign, and raw material substitutions. Waste treatment, control, management, and disposal are not considered pollution prevention, per the definitions under Part 143, Waste Minimization, of the Natural Resources and Environmental Protection Act (NREPA), 1994 PA 451, as amended

**Work in Progress** means a Deliverable that has been partially prepared, but has not been presented to the State for Approval.

**Work Product** refers to any data compilations, reports, and other media, materials, or other objects or works of authorship created or produced by the Contractor as a result of an in furtherance of performing the services required by the Contract.


### Article 1 – Statement of Work (SOW)

### *1.010    Project Identification*

#### 1.011   Project Request
This Contract for the State of Michigan (State), Department of Treasury (Department), Financial Services Bureau, Collection Division (Collection Division) is to provide collection services to pursue the collection of certain unpaid delinquent tax and State agency debt accounts. The Collection Division reserves the right to exclusively manage the assignment of accounts in the State's best interest.

The period of January 6, 2010 through November 15, 2010 will be for implementation and transition for the Contractor; no payment will be made to the Contractor during this period. The Contractor must begin providing all Services, without interruption, on November 16, 2010.

#### 1.012   Background
The Michigan Department of Treasury is legislatively directed by several Public Acts, the primary Act being the Revenue Act (1941 PA 122), to collect delinquent assessed taxes administered by the Department and debts owed to State agencies, including some universities and courts. A copy of the Revenue Act can be obtained on the Michigan Legislature website at www.michiganlegislature.org .

The Collection Division is responsible for the administration of the collection program. Currently, the Collection Division acts as the central agency for the collection of over 300 types of delinquent tax and State agency debts. Non-tax debts include, in part, mental health cost of care accounts; Driver Responsibility Fees; welfare overpayments; District Court costs, fines and fees; and various miscellaneous accounts referred from State departments and agencies. On average the Contractor manages an inventory of 633,000 accounts totaling $1.8 billion.

#### Overview of the Billing and Collections Process
The following is a brief overview of the Department's Billing and Collections Process. A more thorough explanation can be found in the Taxpayer Bill of Rights, which can be obtained on the Department's website at www.michigan.gov/treasury.

##### *Step 1: Initial Efforts to Collect the Debt*
Tax Debts: Tax returns are received, processed and accounted for by the respective taxing divisions. Business taxes are comprised of, but are not limited to, Sales, Use, Withholding, Michigan Business (formerly Single Business), Cigarette, and various Motor Fuel taxes. Corporate Officers are also assessed for business tax debts. Taxes on individuals include, but are not limited to, Individual Income, Cigarette, and Use Tax. Each of the respective tax divisions maintains a separate database for processing tax returns; however, as of the time of issuance of this Contract, the Department is engaged in a project to develop a new integrated tax system that would eventually replace all of the individual legacy systems.

If the Department believes that a taxpayer owes a tax, the Tax Processing Bureau or Tax Compliance Bureau sends a Letter of Inquiry to the taxpayer for the balance of the taxes due. The taxpayer has 30 days to respond to the letter and resolve the debt.

State Agency Debts: To meet due process requirements, the State agency to which the debt is owed is required to notify the debtor of the liability and attempt collection prior to referring the delinquent account to the Department.

##### *Step 2: Referral to the Collection Division*
Tax Debts: If the taxpayer fails to resolve the tax debt within 30 days from the date of the Letter of Inquiry, the Collection Division sends a Notice of Intent to Assess to the taxpayer for the balance of the taxes due. The notice includes information about the amount of tax due, reason for deficiency, and advises the taxpayer of their rights. The taxpayer has 60 days to either pay the amount in full or request an informal conference to resolve the dispute.

State Agency Debts: State agency debts are referred to the Collection Division from various State agencies, courts, and universities. The State agency attempts collection for at least 180 days, and all appeals have been exhausted with the State agency. State agency debts go straight to *Step 3: Final Billing.*



*Step 3: Final Billing*

Tax Debts: If the taxpayer fails to resolve the tax debt or request an informal conference within 60 days of the date of the Notice of Intent to Assess, the Collection Division sends a Bill for Final Taxes Due (Final Assessment) to the taxpayer. Further, in some instances assessments do not go through the first two steps, but are issued directly as final billings. The taxpayer has 30 days to pay the amount in full, make payment arrangements, or make an appeal to the Tax Tribunal. Penalty and interest will continue to accumulate as long as there is a tax balance due.

State Agency Debts: The Collection Division sends a Final Demand Letter to the debtor for the balance of the State agency debt owed. Based on the type of State agency debt, the debtor has a certain number of days to pay the amount in full or make payment arrangements before further collection action is taken.

*Step 4: Escalated Collection Activity*

If the taxpayer fails to resolve the delinquent tax or state agency debt within 35 days of the date of the Final Billing, the Collection Division will proceed with further collection activity. The statute provides the Department with a variety of collection tools to effectuate the collection of the debt as follows:

- May place liens on property for tax debts
- May levy assets, such as bank accounts and wages
- May intercept vendor payments or refund monies owed to the debtor by the State to apply to the debt
- Corporate officers may be assessed for their business tax debt
- May seize and sell property via the issuance of warrants to apply to the tax debt
- The debt may be placed with a private collection agency.

**Overview of the Collection Division**

The collection process is an integrated process stream comprised of three administrative areas. Each area is responsible for a variety of tasks to effectuate the collection of delinquent accounts. The Collection Division's objective is to provide fair and consistent collection practices, while trying to minimize the number of contacts that the public must make with the Department in order to resolve their debts. Further, the Collection Division strives to provide a one-stop-resolution environment for our customers whenever possible. The following is a brief description of the three administrative areas of the Collection Division:

a) Central Office: The Central Office is staffed by approximately 100 employees who provide support for all Collection activities. The Central Office functions include, in part: maintaining a phone center for incoming calls; processing incoming correspondence; activities related to payment processing (location of payments, insufficient funds checks, etc.); issuance and release of liens, levies, and corporate officer liability; systems oversight; and the review and approval of various collection activities [Installment Agreement (IA) plans, requests for write off, penalty waivers, etc.]. Further, the Central Office manages accounts that are not assigned to the private collection vendor and the Field Offices, such as accounts not beyond the appeal process, accounts with foreign addresses, accounts that are currently not collectible or pending write-off, and accounts under review before continuing collection activities. The Division's Quality Assurance monitor(s) will monitor the activities of the Contractor's employees to ensure adherence with the terms and conditions of this Contract.

b) Field Offices: The Collection Field Offices are located in seven communities throughout the State, with the concentration of staff located in South Eastern Michigan. There are approximately 70 employees assigned to these offices. The Field Support staff provides information to taxpayers regarding the collection process, accepts payments, and other collection related activities. Accounts assigned to the Field are largely in-State business tax accounts and related Corporate Officer debt. Revenue Officers pursue debts through field visits to the debtor, along with telephone and written contacts. Warrant Officers are assigned accounts to take the escalated enforcement step of issuing a warrant for seizure and sale of the business assets.

c) Private Collection Contract: The Department contracts with a private collection agency to collect delinquent tax and State agency debts. The Collection Division, though the CCI (see section 2.022), manages, monitors and provides oversight of the Contractor's collection activities to ensure fair, consistent collection practices that are in compliance with the terms of this Contract and with State and Federal Fair Debt Collection Practice Acts. Collection Division staff, to include the Interface Unit, will work closely with the Contractor to support the efforts of the Contractor.


The Collection Division utilizes the STAR system and MARCS to manage and maintain all accounts for individual and businesses debtors. MARCS is a commercial off-the-shelf software (CACS-G) that was developed by American Management Systems and customized for the State. The administration of the collection systems is conducted in the Lansing area; however, systems users are located in multiple locations and in multiple State agencies throughout the state of Michigan.

The Collection Division Systems Operations Assistant Administrator and the Collection Division Systems Team liaisons with the Contractor's system administrator and system team to address any system issues related to the administration of this Contract. State personnel will play an active roll in all aspects of the project in order to assure that the Department staff gain sufficient knowledge of the design and operation of the system, so they can monitor its use and maintain the STAR system interfaces in the future. Up to four state personnel will provide subject matter expertise concerning the various functions and active review and coordination of the process. State personnel will also perform necessary acceptance testing procedures. They will provide the CCI with a recommendation of the readiness of the software and interfaces for implementation.

In addition, the MDIT is responsible for advising the Department on information technology issues, from project planning, compliance with State IT standards, security, and IT operations. The MDIT will assign a technical project coordinator (project manager) who will be the primary point of contact for the Collection Systems Team and Contractor to coordinate all MDIT resources if and when required.

### 1.020    Scope of Work and Deliverables

### 1.021   In Scope

The Contractor must provide collection services on behalf of the State. The Contractor must be registered to perform collection activity in the State prior to actively collecting debts on the State's behalf.

As part of the Collection Operation, the Contractor must provide the following:

1) Collection services for unpaid delinquent tax and state agency debt accounts (see section 1.022.1). The Collection Division reserves the right to exclusively manage the assignment of accounts in the State's best interest. The Contractor must only provide collection services on accounts as determined by the Collection Division. Collection services/activity must not be subcontracted to a third party collection agency.

2) Collection services at a dedicated location within a 20 mile radius of the State Capitol in Lansing, Michigan (see section 1.022.2). All collection services will be performed by a dedicated staff employed by the Contractor solely for the purpose of the collection of Michigan delinquent tax and State agency debts. The proximity of the Contractor to the Collection Division Administration will enhance the Collection Division's quality control and the working relationship with the Contractor.

3) In addition to the collection services stated in this work statement, Contractor must provide directly, or through subcontracting, system software staff to maintain and enhance as necessary the MARCS and to assure reliability for the MARCS operations. Functional system requirements are further discussed in Exhibit A (see section 1.022.3).

4) Establish and/or maintain the necessary and reliable interfaces and connectivity between the MARCS system and the Department's system(s), along with all technology and equipment necessary, at the Contractor's expense. Details of interfaces and connectivity are discussed in Exhibits A and B (see section 1.022.3).

5) Provide staff to process Bankruptcy petitions and generate claims related to delinquent debtors, as well as maintain accounts in bankruptcy status (see section 1.022.1.j). On average 3,000 bankruptcy claims are expected to be filed annually. The Department currently utilizes the BCP system, which interfaces with MARCS, to assist in managing and maintaining bankruptcy accounts.

6) Provide staff and necessary equipment and software to image, print and process correspondence, along with additional services that are a part of the collection operation for all accounts assigned to the Contractor (see section 1.022.1.k, 1.022.1.l and Exhibit A). 579,384 pages (approximately 71,400 documents) were scanned in 2008 (includes MARCS correspondence); furthermore, approximately 544,000 letters are printed annually.


7) Provide staff and necessary equipment to image correspondence for accounts assigned to the Collection Division (see section 1.022.1.k Exhibit A). The Department will compensate the Contractor for costs associated with imaging related to accounts not assigned to the Contractor. 556,663 pages (approximately 68,600 documents) were scanned in 2008 (includes Department correspondence).

8) Provide courier service for pick-ups and deliveries between Contractor's site and the State's Secondary Complex twice per day (see section 1.022.10).

## 1.022   Work and Deliverable
Contractor must provide Deliverables/Services and staff, and otherwise do all things necessary for or incidental to the performance of work, as set forth below:

Contractor must provide Deliverables/Services and staff for the collection of delinquent taxes and State agency debt accounts referred to the Contractor by the Collection Division in accordance with the terms and conditions set forth herein, and otherwise do all things necessary for or incidental to the performance of work, as set forth below:

2) **Collection Services**

    a) The Contractor must provide collection services for the types of taxes and debts on an as needed basis when requested by the Collection Division.

    b) The Collection Division reserves the right to exclusively manage the assignment of accounts in the State's best interest. The Contractor must only provide collection services on accounts as determined by the Department. Accounts that may not be referred include, but are not limited to, delinquent active business accounts, accounts involved in litigation, and student loan debts. The Contractor must immediately cease collection activity on any accounts as determined by the Collection Division.

        i. <u>Recall of Accounts</u>: Any and/or all delinquent accounts may be systematically withdrawn by the Department at any stage of the collection process without prior notice and at the sole discretion of the State. Further, upon oral or written notification, the Contractor must immediately cease activity on a delinquent account. Reasons for recall of accounts will include, but not be limited to, the following:

            (1) An account(s) may be recalled to resolve substantial issues
            (2) An account(s) will be recalled when a debtor has filed for protection under the Federal Bankruptcy Act.
            (3) An account(s) may be recalled to reassign the account to the Field Office to make personal contact with the debtor.

    c) The Contractor must accept for collection any and all delinquent tax and State agency debt accounts including debts not currently administered by the Collection Division.

    d) The Contractor must actively pursue each account on a routine basis until the account is resolved; the legal time-frame for collection has expired; or the account is recalled by the Collection Division (also see section 1.022.6.a for Account Resolution Rate).

    Work lists are established to allow for collection activity on each account. Work lists are regularly analyzed and modified as needed to ensure that all accounts are actively pursued. If an account is identified as needing activity, steps are taken to ensure it receives the proper work effort. Work lists present accounts so they are actively pursued on a routine basis. Routine analysis of inventory is performed to ensure that all accounts are actively being pursued   System rules are changed as needed to guarantee the most effective work efforts.

    e) All information furnished to the Contractor by the Collection Division will be obtained from sources deemed reliable; however, the accuracy of the information is in no way guaranteed by the Collection Division. The State or its several departments is not liable for any damages suffered by the Contractor as a result of reliance on said information. Nothing in the Contract is deemed to waive sovereign immunity.

    Analysis of provided information is performed upon receipt of an account. Any recent updates to taxpayer information found using a source deemed reliable is added to the account and shared with Treasury.



f) The Contractor must utilize a fair, consistent collection process that maintains compliance with the State and Federal Fair Debt Collection Practice Acts.

   i. Emphasis on all accounts referred must be securing full payment within the shortest possible time frame.
   ii. The Contractor's employees interacting with the public on the State's behalf must be sufficiently trained to provide accurate and pertinent information and be held to the highest standards of telephone etiquette and professionalism.
   iii. Complaints must be immediately addressed by the Contractor's supervisory staff and/or by Department staff, as determined by the CCI. A written summary of the complaint, actions taken, and resolution must be provided to the CCI

Collectors are trained to gather the information necessary to obtain the best possible arrangement for each account, with an emphasis on securing full payment within the shortest possible time frame. Contractor employs a "Firm, Fair, Friendly" collection strategy. Collection personnel receive extensive training regarding the Fair Debt Collection Practices Act and the Consumer Credit Protection Act during new hire and ongoing training. Every new hire and current employee must pass the FDCPA test with a score of 100% before taking any live calls. In addition, a test on FDCPA requirements is administered twice yearly, and every employee in the center is required to pass the test with a score of 100%. Contractor demands full compliance and ensures this with monthly prevention meetings specific to the FDCPA. The topics for these meetings are forwarded to each center by Contractor's Vice President of Regulatory Affairs.

Contractor emphasizes customer satisfaction and positive customer response during its initial and follow-up training sessions. In a collection environment the objective is two-fold: collect the debt and maintain customer satisfaction. Collecting the debt while treating the patron poorly results in short-term collection results and causes potential ill will. Extensive new hire and ongoing training ensures account representatives are equipped with the voice control, scripts, and guidelines they need to consistently and uniformly implement this strategy. All Contractor account representatives continue to receive monthly refresher training in complaint prevention.

Contractor continually emphasizes their commitment to training and complaint prevention with refresher courses, and updates training materials to reflect any changes required by clients or regulatory mandates.

In order to further ensure that all laws, rules, regulations, and standard operating procedures are being adhered to, each of Contractor's collections service centers is audited regularly by quality assurance and management personnel, and by corporate auditing staff. All account representatives will be required to successfully complete a four-week comprehensive training class. Furthermore, all account representatives must successfully complete a certification test of the Fair Debt Collection Practices Act (FDCPA).

g) The Contractor must attempt to achieve maximum recovery of each account using techniques which must include, but not be limited to, the following:

   i. Telephone calls (see section 1.022.6.c for Telephone and Written Contact Accessibility, Efficiency and Performance Metrics requirements)
   ii. Mailed correspondence (see sections 1.022 6.b and c)
   iii. Skip-tracing activities to locate Social Security Numbers, debtor addresses, telephone numbers, etc.
   iv. Locator networks
   v. Employee and Asset Information: The Contractor must ascertain and document in MARCS employment, asset and location information.

Outgoing calls can be generated manually or by a dialer. Contractor has identified the top 40 hours that are prime time to maximize right party contacts. Collection letters are sent to generate inbound calls, maintain account diligence, and Treasury compliance. Skip-tracing is conducted by both account representatives on an individual account basis in real-time and batch processes

Skip-trace vendors are regularly scrutinized and subjected to champion/challenger review to ensure the most effective resources are employed. All employment and asset information obtained is documented in the asset window on MARCS.


h) <u>Account Documentation</u>: The Contractor must thoroughly document in MARCS any actions taken on debtor accounts including, but not limited to, interest and penalty updates, status changes, demographics, adjustments and payment applications, details of any repayment schedules, skip-tracing activities, debtor contacts and attempted contacts, and debtor employment and asset information.

Contractor consistently reviews and enhances training to ensure proper documentation. The quality assurance department monitors account representatives on documentation to ensure that it is complete and accurate. Collectors are trained to contemporaneously add notes while working specific accounts in order to ensure that the information is accurately and timely recorded on any/all individual account.

i) <u>Lien and Levy Process (Also See Sections 1.022.6.i and j for Lien Record Processing and Lien Processors/Liens Available Performance Metrics)</u>

  i. The Contractor must participate in the lien and levy process by recommending issuance of liens and levies for the approval of the Collection Division. The Contractor will not seek court ordered judgments in collecting these debts. Liens are issued on taxpayer accounts only.

  Contractor has a specialized lien and levy group that, in partnership with the quality assurance department, processes all requests and ensures that all steps have been accurately taken before a lien or levy is pursued.

  ii. At least two telephone contact attempts are required with the debtor prior to the Contractor recommending the issuance of a levy.

  No account is pursued on a levy/lien basis until all required diligence required is satisfied and documented. Understanding that this process may be modified in the future, Contractor's systems and procedures are designed to be fluid in the event that the State decides to modify the desired level of communication between Contractor and the taxpayer in advance of Contractor's recalcitrant debtor collection practices.

j) <u>Bankruptcy Processing (Also See Sections 1.022.6 f, g and h for Bankruptcy Petition Rate, Claim Processing Rate and Account Processing Rate Performance Metrics, and 1.031.5 for Bankruptcy Staff)</u>

  i. The Contractor must process bankruptcy petitions and generate claims related to delinquent debtors, as well as maintain accounts in bankruptcy status.

  ii. The Contractor must monitor accounts through the bankruptcy process in accordance with bankruptcy law, court rules, and court orders.

  iii. Tasks related to maintaining bankruptcy accounts include, but are not limited to, removing the account from active collections, updating account balances, amending claims as needed, and redistributing payments within accounts per court orders.

  iv. The Contractor must utilize a claim and processing management system that interfaces with MARCS and other State systems for processing bankruptcy claims and to manage bankruptcy accounts. Further details regarding bankruptcy processing are discussed in Exhibit A, section 8.11.

MARCS supplies the Collection Division with a specialized bankruptcy unit to track accounts from the initial filing of bankruptcy to its dismissal. Contractor utilizes the Bankruptcy Claim Pro (BCP) application to process bankruptcy petitions and generate claims. ███████████████████
████████████████████████████████

k) <u>Imaging</u>

  i. The Contractor must image and process collection related correspondence as requested by the Collection Division. Details regarding image and correspondence processing are described in Exhibit A, sections 7.13 and 8.6, and Exhibit G, section 7.7 (see section 1.022.6.e for Imaging and Correspondence Processing Rate performance metric).

 
Scanned correspondence is identified by the type of document, the source from which it was received, and the responsibility code of the department responsible for the account. The MARCS application has functionality to display the scanned correspondence to the user with standard image viewing software. All collection correspondence is linked to the corresponding account within 24 hours of receipt by the MARCS/Contractor mail room.

   ii.  Images must be attached to related accounts.

All mail/email/fax correspondence received is linked to the corresponding account within 24 hours of receipt by the MARCS/Contractor Mail room.

   iii.  <u>Retention of Documents:</u> The Contractor must retain paper copies of documents and reports in a secure location for a period of time determined by the Department and in accordance with the Department's policies and procedures for safeguarding confidential data.

      (1) After the retention period, the Contractor must dispose of the documents in accordance with the Department's policies and procedures as described in Exhibit C, Safeguard Requirements of Confidential Data (see section 1.022.9.o.ii).

l)  The Contractor must provide collection related printing services as requested by the Collection Division. Details regarding printing services are described in Exhibit A, sections 5.17, 8.2 and 8.18.2, and section 1.021.6 of this Contract. The Contractor must provide paper, envelopes, printing, inserting, folding, sealing, preparation, delivery, etc., and the State will pay mailing and equipment costs (see section 1.022.10 and Exhibit G, section 7.6).

Contractor will provide collection related printing services at no cost to the State from generation to mail preparation including printing, folding, sealing, and delivery to the State's mail operations. Documents are tracked from creation to print to ensure that all documents are printed.

m)  <u>Installment Agreements (IA):</u> Any IA must be made in accordance with the Collection Division's policies and procedures. IA may be arranged with the debtor based on the debtor's financial condition and consideration of individual agencies' requirements and/or supplemental Contract specifications. The Collection Division maintains repayments standards similar to the Internal Revenue Service.

Collectors are trained to gather the information necessary to obtain the best possible arrangement for each account, with an emphasis on securing full payment within the shortest possible time frame. MARCS has online controls to support the Collection Division's policies and procedures regarding minimum payment calculations. Furthermore, MARCS has online windows to allow the creation of installment agreements, along with the documentation of the debtor's financial condition.

n)  <u>Penalties and Interest:</u> Where collection penalties have been imposed under the Michigan Revenue Act, the Contractor must assist the State in collecting penalties and interest accrued on the debt.

The MARCS system ensures the proper penalty and interest are added to accounts based on monthly STAR updates. The MARCS system has programs in place to project penalty and interest in the event the State updates are delayed. MARCS has the ability to project penalty and interest through the repayment period to ensure that any payment arrangements will pay off the current balance, plus any future penalty and interest adjustments.

i)  Michigan law prohibits the waiver of tax and highly restricts the waiver of interest. Penalty may be waived by the Department if such a waiver is deemed appropriate based upon reasonable cause. When a debtor requests that the penalty be reduced or waived, the Contractor must immediately forward the written request and all pertinent information to the Collection Division and the Contractor must cease collection efforts until the request is resolved by the State unless specifically directed to continue collection activities.

o)  <u>Collection Enhancements:</u> The Contractor must meet with the State at a minimum of annually to propose and discuss additional tasks, activities, or technological solutions that will enhance the opportunity to improve the processes and results of collection efforts.


p) Skip-Tracing Activities

   i. Upon Contract implementation, the Contractor must enter into discussions with the Department to develop mutually agreed upon skip-tracing work strategies and reporting criteria that provide the Department with a reasonable assurance that all accounts are appropriately reviewed periodically for the most up to date information that will assist in the collection effort.

   Contractor will work with the Department to develop and further enhance the mutually agreed upon skip-tracing work strategies and reporting criteria to ensure that all accounts maintain the most up-to-date information. Reporting will be in place to provide the Department with assurance that all accounts receive the reasonable skip-tracing efforts.

   ii The Contractor must demonstrate to the Department that the skip-tracing effort is continuous and consistent during the period that the Contractor retains the account.

   Contractor will demonstrate to the Department that skip-tracing is continuous and consistent by providing the Department with reporting that details skip-tracing efforts on accounts assigned to MARCS. All reporting is evaluated for constant improvements to ensure the Department is provided with the most up-to-date information regarding skip-tracing activity.

   iii. The Contractor must provide the Department with detailed policy and procedures outlining the Contractor's skip-tracing tools, techniques, and methodology used to ensure all collection avenues have been exhausted before recommending that an account is uncollectible.

   See skip-tracing procedures in Exhibit 15. Updates to skip-tracing procedures will be provided and enhanced as new contact resources and/or techniques become available.

   iv. The Contractor must reimburse the State for the actual United States Postal Service cost of processing returned mail on accounts assigned.

   To ensure mail is being sent to the most appropriate address for the taxpayer/debtor, Contractor will engage the use of address enhancement and validation services, including the National Change of Address service provided by the Postal Service. These services will be provided at no additional charge to the State.

3) **Facilities Requirements**

a) All collection services performed by the Contractor must be performed from a location within a 20 mile radius of the State Capitol in Lansing, Michigan.

   Contractor's local office in ███ , Michigan is located at:

   ████████████████████████████

b) The location must have a dedicated link to the State's ████████████████
████████████████████████████████████████

   i. An overall detailed architectural diagram including detailed graphics displaying the listed hardware and its relative placement in the architecture is in Appendix 1 (latest MARCS Technical Architecture). Communication channels between hardware units, identifying things like encryption where appropriate are marked.



c) The location must be dedicated solely to the collection of delinquent Michigan taxes and Michigan State agency debts associated with this Contract.

The programs managed within this office that are specific to debt authorized to be managed by Contractor for other State agencies are handled in a dedicated, secure environment.

d) The Contractor must ensure the facility meets all security requirements outlined in this Contract, including being equipped with security measures to ensure secured access by employees. Physical security requirements are further discussed in section 1.022.9.k, Exhibit A and Exhibit C.

Contractor meets all security requirements and is committed to continue researching enhancements in security systems, such as biometrics

e) The facility must not have any visible signs as to their function or association with the State for reasons related to security.

f) The Contractor is responsible for all costs associated with the acquisition of space, furnishings, office equipment, security requirements and non-Systems Team staffing. Additional costs should be anticipated for electricity, janitorial services, parking, etc. if needed, and will be the sole responsibility of the Contractor.

g) The Contractor must provide the following:

   i. Adequate space on-site for 10 State employees to perform oversight and liaison functions.

   ii. Access for State employees to at least one conference room to accommodate at least 20 meeting attendants.

Contractor has identified 1,500 adjacent square feet to the existing office location in Lansing, MI, that Contractor will lease and renovate to accommodate the required 10 on-site employees and conference room. Costs associated with the construction of this adjacent office space will be absorbed by Contractor to include tenant improvements, furniture, wiring and telecommunications equipment. All future costs related to associated taxes, recurring telecommunications expense, and security upgrades will also be absorbed by Contractor, thus making the office space cost-neutral to the State.

h) Description of the Data Center, Including Geographic Location and All Relevant Environmental Factors Such as Power, HVAC, Floor Space, Proposed Layout, User Accessibility, Network Configuration and Level of Redundancy

The Data Center is located at ███████████████████████████████████████.

████████ The Data Center has approximately 1500 square feet of area with a raised floor. HVAC consists of ████████████████████. The Data Center and Operations office will contain a fire suppression system. Maximum power is ██████████████ of which one-third is currently used. Redundancy is built into the servers through multiple CPUs, dual power supplies, RAID technology, and hot swappable disk. A current layout is in Appendix 2 (Proposed Computer Room Layout). In addition, Contractor also has a comprehensive and proven disaster recovery plan to allow us to immediately respond to any type of emergency or catastrophic event.

i) Requirement Deleted.

j) Data Center Capabilities That Include the Following:

   i. Dedicated and/or Shared Servers
   ii. Platforms Supported
   iii. Available Software Offerings
   iv. Available Storage Space
   v. Reliability and Performance Boosting Efforts (e.g., Caching, Mirroring, and Load Balancing)
   vi. Range of Services Available (Including Application Management, System Integration, Benchmarking, High-Availability Configurations and Disaster Recovery).


All servers are dedicated and solely used for this project. This includes network servers, production and development database and application servers, print servers, web servers, storage servers and communication servers.

- Database and application servers: ███████████
- Print servers: ████████████████████████ handles the day to day desktop print requirements (gets the print request from the desktop to the network printer)
- Network servers: ████████████
- Web servers: ████████████
- Communication servers ███████████████████ which is planned to be replaced with a new phone switch)
- Storage servers: ███████████████ .

Development and network platforms share storage on an ███████████ with over 6TB available storage. Development server also has access to a ████████████ storage array. Storage solutions and servers are fault tolerant with redundant power, various RAID disk configurations, and hot-swappable components.

3) <u>Equipment and MARCS Software Requirements</u>

    a)   At a minimum, the Contractor must provide and maintain at its expense the following equipment:

        i.   All furnishing and office equipment for Contractor staff.
       ii.   Furnishings and office equipment for 10 State employees to perform oversight and liaison functions (see section 1.022.2.g). Office equipment must include, but is not limited to, personal computers, phones, copiers, printers, and fax machines.
      iii.   Printers, to include a high volume printer.
      iv.   Predictive Dialer capable of multiple calling campaigns, recording and producing reports for statistical reporting and audit trails.
      v.   Quality assurance equipment capable of monitoring screen movements while listening to and recording phone calls for Contractor staff (see Exhibit A, section 8.10).
      vi.   Quality assurance monitoring equipment for up to four State employees to listen to telephone calls and view accounts of staff working in MARCS (see Exhibit A, section 8.10).
     vii.   Hardware and software requirements for the operation and maintenance of a bankruptcy claims and processing management system, such as BCP as described in Exhibit A, section 8.11.

    b)   The Contractor must establish, operate and maintain MARCS as described in Exhibit A and section 1.022.3 of this Contract.

    c)   Contractor must provide the software in Exhibit A.

    d)   The Contractor will work closely in association with MDIT and Collection Division staff to establish, operate, and maintain MARCS.

    e)   The State must retain ownership of the MARCS software (see section 2.260). The State reimburses the current Contractor for providing and maintaining the MARCS hardware and software as described in Exhibits A and G.

The State must have the right to copy, manufacture, display and create derivative works for the sole purpose of the State. All products produced as a result of the execution and completion of the terms of the Contract are the sole property of the State. All property rights, including publication rights, in the interim draft and final reports, programs, and documentation, including machine-readable media, and other work products produced in connection with the work provided under the Contract belong to the State.

It is contemplated that during the course of the Contract the Contractor will write code that modifies the functionality of the Baseline Software consistent with the required functionalities not otherwise provided in the Baseline Software. Such customization and modifications will be performed at the request of the State, and sold to the State as part of System Modifications price (see Attachment A). In view of the modifications contemplated, the resulting software must belong to the State.


There must be no prohibition from use by the State of more than one copy of the customized package software, whether on one or more computers. The State is not obligated to the payment of any ongoing license fees following full acceptance of the system.

Subcontractor (CGI) will retain all ownership rights in and to any CGI intellectual property incorporated into a deliverable, or any CGI intellectual property separately licensed to the State. CGI will not be prohibited from using ideas, concepts, expressions, know-how, skills and experience possessed by it prior to, or developed or learned by it in the course of, performance under the Contract.

f) The State will reimburse the Contractor for all MARCS system, network infrastructure and information technology related costs (e.g., software license fees, servers, Systems Team staff and computers for Systems Team staff). (See section 1.031.2 for additional information on Systems Team.)

   i. The State will not reimburse the Contractor for non-Systems Team staff computers, software, etc. (e.g., collection services call center staff).

   ii. The Contractor must upgrade the equipment and software in Exhibit G during the first Contract year. Equipment and software must be equivalent or better than the current system to meet Performance Metrics (section 1.022.6) and Service Levels (section 1.022.3.j) identified in this Contract.

Contractor makes the following recommendations for upgrading current equipment in order to best position the State for the future (also see Attachment A):



- Replace the existing ▮▮▮▮▮▮▮ production server with an ▮▮▮▮▮,
- Replace the existing ▮▮▮▮▮▮▮ development server with an ▮▮▮▮
- Replace the ▮▮▮▮ server with a ▮▮▮▮ enterprise server
- Replace ▮▮ with ▮▮
- Replace ▮▮ with ▮▮
- Replace ▮▮ with ▮▮
- Add a ▮▮▮ for Production only use
- Replace existing production network servers ▮▮▮▮ Servers will be replaced with ▮▮▮ Servers and ▮▮▮ Server will be replaced with ▮▮▮ server
- Replace existing ▮▮▮ with a ▮▮▮ server
- Replace existing ▮▮▮ with a ▮▮▮ server
- Replace all ▮▮ existing switches with ▮▮ switches
- Replace workstations with ▮▮▮ workstations.

Contractor continually reviews, researches, and tests new technologies to determine their potential value for inclusion into the MARCS solution.

Replacement of existing CTI communications server will take place within the 12 months prior to the start of the Contract with no interruption of service.

g) The Contractor must not utilize MARCS for any purpose not related to the terms of this Contract (also see section 1.022.1.h). The system must not house any data that is not expressly related to this Contract.

h) During the life of this Contract, there will be necessary modifications to MARCS to include, but not limited to, promoting efficiency, enterprise-wide information technology initiatives, and/or compliance with legislative mandates. The Contractor is responsible for all modifications and specifications of the collection system, after conducting a thorough and careful design process involving State staff. The State's functional requirements must be compared to the detailed design of the software package to determine precisely the modifications and enhancements required to satisfy the State's requirements. The Collection Division will provide business expertise concerning collections operations and coordination of the process. State personnel will also perform necessary acceptance testing procedures (see section 1.050 of Contract and Exhibit A, section 8.24).



Contractor will use their proven development methodology and leverage their business expertise, and Subcontractor's (CGI) technical expertise, to provide documented steps for requirement gathering, complete functional design and approval, technical design and approval, thorough quality assurance, and user acceptance and implementation. The methodology provides extensive opportunity for involvement of the user community for design and approval.

i.  The Department is in-process of implementing SAP software for a new integrated tax processing and administration system for tax and revenue management. The SAP Tax & Revenue (TRM) solution will utilize the SAP Portal to provide the capability to use the Tax Agent work center, which provides tax return exception handling functionality. The Project will leverage SAP ERP (primarily the PSCD – Public Sector Collections and Disbursements functionality) as a platform and connect to many related systems and technologies used.

Research is being completed to determine the suitability of SAP or similar software replacing STAR, GAL and MARCS. It is anticipated SAP will replace STAR during the 3rd and 4th years of this Contract and will replace GAL in the 5th and 6th years of the Contract; furthermore, SAP might replace MARCS after the 5th or 6th year of the Contract.

> (1) If the Department determines SAP will replace STAR, the Contractor must provide resources for conversion, modifications and interface development for interfaces identified in Exhibit B. The price for Systems Modifications will be utilized (see section 1.022.3.e and Attachment A, section 4e).

Subcontractor (CGI) has a close relationship with SAP and is a certified SAP Alliance Partner. Through their practice, Subcontractor employs over 800 employees, 70% of which are SAP certified.

> (2) If the Department determines SAP will replace GAL, the Contractor must provide resources for conversion, modifications and interface development for interfaces identified in Exhibit B. The price for Systems Modifications will be utilized (see section 1.022 3.e and Attachment A, section 4e).

> (3) If the Department determines SAP or similar software will replace MARCS, the Contractor must provide resources for conversion, modifications and interface development for interfaces identified in Exhibit B. The price for Systems Modifications will be utilized (see section 1.022 3.e and Attachment A, section 4e). If MARCS is replaced, the overall structure of this Contract will be reviewed with the Contractor

i)  The State or its several departments is not liable for any damages suffered by the Contractor as a result of work stoppages resulting from, or not limited to, network downtime, system downtime, or interface downtime.

j)  The Contractor must comply with the Service Levels identified in Exhibit D. The Collection Division will collaborate with the Contractor to revise and update the Service Levels periodically throughout the life of the Contract. (Also see section 2.242.)

k)  The MDIT is required to follow the SEM that was governed by the SUITE. As a result of SEM:

i.  The Contractor's methodology, project templates, stage exits and deliverables must be mapped to corresponding SUITE templates, stage exits and deliverables (also see section 1.022 3.h).

Contractor's methodology that has been endorsed by Treasury personnel is in Appendix 3 (SEM Methodology Mapping) along with the methodology mapping and a comparison. If Collection Division personnel require methodology mapping to comply with the SEM that was governed by the SUITE, Contractor will comply with request.

ii.  An Enterprise Solution Assessment is required when changes occur to connectivity with the State at the Contractor's boundaries.

l)  Facility/Data Center

i.  Contractor's Underlying Transport Network (or Networks) to be Employed in Enabling the Solution [Includes Size of Network, Transport Protocol Employed, Security Scheme for the Network, General Network Topology (Including Internet Connectivity, Etc.)]

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OTSEGO



STEPHEN SPENCE, on behalf of
himself and a class of all others
similarly situated,

               Plaintiffs,

vs

GC SERVICES LIMITED PARTNERSHIP,
A Delaware limited partnership, and
SHEILA M. FEWS, an individual,

               Defendants.

File No:  18-17462-CZ  Text

Hon. Colin G. Hunter

_____/

LAWRENCE A. FRIEDMAN    (P36935)
Attorney for Plaintiff
Post Office Box 609
Grayling, MI  49738
317-501-4671
*lfriedman@friedmanpartners.net*

WM PAUL SLOUGH    (P70489)
Co-Counsel for Plaintiff
145 North Otsego Avenue
Gaylord, MI  49735
989-732-2912
*paul@gaylordlaw.com*

_____/

## **PROOF OF SERVICE**

The undersigned hereby certifies that on the 26th day of October, 2018, she sent a copy of **PLAINTIFF'S MOTION FOR ENTRY OF PRELIMINARY INJUNCTION; BRIEF IN SUPPORT OF MOTION FOR ENTRY OF PRELIMINARY INJUNCTION; and NOTICE OF HEARING** regarding the above-captioned matter by mail to:  **SHEILA M. FEWS, 5890 ROTHESAY ROAD, LANSING, MI 48911-8410; SHEILA M. FEWS, C/O GC SERVICES LIMITED PARTNERSHIP, 5015 S CEDAR STREET, #260, LANSING, MI  48910 and GC SERVICES LIMITED PARTNERSHIP, C/O THE CORPORATION COMPANY, 30600 TELEGRAPH ROAD, BINGHAM FARMS, MI 48025** with postage fully prepaid thereon.  I declare the above statements to be true to the best of my knowledge, information and belief.

                                *Connie D. Stubli*
                _____
                Connie D. Stubli
                KIRKPATRICK DuBOIS & SLOUGH PLC
                145 North Otsego Avenue
                Gaylord, MI  49735

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OTSEGO

STEPHEN SPENCE, on behalf of
himself and a class of all others
similarly situated,

                    Plaintiffs,

vs                                                      File No:  18-17462-CZ

GC SERVICES LIMITED PARTNERSHIP,                        Hon. Colin G. Hunter
A Delaware limited partnership, and
SHEILA M. FEWS, an individual,

                    Defendants.

_____/

LAWRENCE A. FRIEDMAN      (P36935)
Attorney for Plaintiff
Post Office Box 609
Grayling, MI  49738
317-501-4671
*lfriedman@friedmanpartners.net*

WM PAUL SLOUGH      (P70489)
Co-Counsel for Plaintiff
145 North Otsego Avenue
Gaylord, MI  49735
989-732-2912
*paul@gaylordlaw.com*

_____/

## NOTICE OF HEARING

        **PLEASE TAKE NOTICE** that the Plaintiff's **MOTION FOR ENTRY OF PRELIMINARY INJUNCTION** will be brought on for hearing before the Honorable Colin G. Hunter, Circuit Judge, in his Courtroom, in the Courthouse, in the City of **GAYLORD**, County of Otsego, State of Michigan, on the **4TH** day of **DECEMBER**, 2018 at **11:30** o'clock in the **FORE**noon, or as soon thereafter as counsel may be heard.

Dated:  October 25, 2018

                                        _____
                                        WM PAUL SLOUGH          (P70489)
                                        Co-Counsel for Plaintiff

                                        KIRKPATRICK DuBOIS & SLOUGH PLC
                                        145 North Otsego Avenue
                                        Gaylord, MI  49735
                                        989-732-2912   *paul@gaylordlaw.com*

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OTSEGO

STEPHEN SPENCE, on behalf of
himself and a class of all others
similarly situated,

                  Plaintiffs,

vs

GC SERVICES LIMITED PARTNERSHIP,
A Delaware limited partnership, and
SHEILA M. FEWS, an individual,

                  Defendants.

File No: 18-17462-CZ

Hon. Colin G. Hunter

_____/

LAWRENCE A. FRIEDMAN    (P36935)
Attorney for Plaintiff
Post Office Box 609
Grayling, MI 49738
317-501-4671
*lfriedman@friedmanpartners.net*

WM PAUL SLOUGH    (P70489)
Co-Counsel for Plaintiff
145 North Otsego Avenue
Gaylord, MI 49735
989-732-2912
*paul@gaylordlaw.com*

_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

At a session of the Court, held in the Courthouse,
in the City of Gaylord, County of Otsego, State of
Michigan, on the _____ day of _____,
2018.

PRESENT: HONORABLE COLIN G. HUNTER,
                 Circuit Judge

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OTSEGO

STEPHEN SPENCE, on behalf of
himself and a class of all others
similarly situated,

                    Plaintiffs,

        vs

GC SERVICES LIMITED PARTNERSHIP,
A Delaware limited partnership, and
SHEILA M. FEWS, an individual,

                    Defendants.

_____/

File No:  18-17462-CZ

Hon. Colin G. Hunter

LAWRENCE A. FRIEDMAN    (P36935)
Attorney for Plaintiff
Post Office Box 609
Grayling, MI  49738
317-501-4671
*lfriedman@friedmanpartners.net*

WM PAUL SLOUGH    (P70489)
Co-Counsel for Plaintiff
145 North Otsego Avenue
Gaylord, MI  49735
989-732-2912
*paul@gaylordlaw.com*

_____/

## PLAINTIFF'S MOTION FOR ENTRY OF
## PRELIMINARY INJUNCTION

Plaintiff Stephen Spence, on behalf of himself and a class of all others similarly situated, through his attorneys Kirkpatrick DuBois & Slough PLC, move this court for the entry of a preliminary injunction against Defendants, and state the following in support:

1.     This case is a class action lawsuit against Defendant GC Services Limited Partnership ("GC Services") and its license holder manager, Sheila M. Fews, Agency License No.

2401002937, Manager License No. 2402001187. A copy of the complaint is attached as *Exhibit 1* to this motion.

2.     GC Services independently contracts with the State of Michigan to collect over 300 types of delinquent tax and state agency obligations including, but not limited to, sales, use and withholding taxes, individual income taxes, driver responsibility fees, welfare overpayments, and district court costs, fines and fees ("the Contract").  In FY 2017 alone, GC Services collected nearly $170 million in Tax and Non Tax obligations and was paid nearly $30 million in commissions.

3.     Defendants collect these obligations ostensibly owed to the State of Michigan by sending letters, statements, and other correspondence to persons and entities demanding payment (the "demand letters").

4.     This lawsuit is a class action against Defendants for violations of Article 9 of the Michigan Occupational Code, MCL 339.901 *et seq,* ( "Article 9"), and for breach of the Contract as a third-party beneficiary, which requires GC Services to maintain compliance with the Fair Debt Collection Practice Act, 15 USC § 1601*, et seq* ("FDCPA").

5.     As set forth in Count I of the complaint, Defendants' demand letters violate MCL 339.915(c), which broadly prohibits the use of any printed forms of a government agency by a licensee; and MCL 339.915a(p), which prohibits operating under a name or in a manner that implies or states that the licensee is a branch of, or associated with, or have been approved or licensed by, the Michigan Department of Treasury.

6.     As set forth in Count II of the complaint, GC Services promises in the Contract that it will implement and adhere to FDCPA standards in collecting debts from members of the Class, as well as "utilize a fair, consistent collection process that maintains compliance with the State and Federal Fair Debt Collection Practice Acts."  *Complaint, Exhibit 2.*

7.     GC Services has contractually undertaken to give or to do or refrain from doing something directly to or for said members of the Class; thus, members of the Class, including

Plaintiff, are third-party beneficiaries of the Contract under MCL 600.1405 and Michigan common law.

8.     GC Services continues to breach the Contract by sending demand letters that do not comply with the Contract's requirements.

9.     For these reasons, the Class is likely to prevail on the merits.

10.    Failure to issue an injunction will result in ongoing and future violations by Defendants.

11.    Members of the Class have no adequate remedy at law to prevent Defendants' ongoing and future violations.

12.    Article 9 specifically authorizes equitable relief to prevent violations. MCL 339.916(1).

13.    An injunction requiring Defendants to comply with Article 9 and the terms of the Contract is in the public interest and not contrary to public policy.

14.    Plaintiff has made a good faith effort to inform Defendants of their violations and request they cease, to no avail.

15.    In further support, Plaintiff relies on the attached brief.

Plaintiff requests that this court enter a preliminary injunction requiring Defendants to comply with Article 9 and the terms of the Contract during the pendency of this litigation.

Dated:  October 25, 2018

WM PAUL SLOUGH                              (P70489)
Co-Counsel for Plaintiff

KIRKPATRICK DuBOIS & SLOUGH PLC
145 North Otsego Avenue
Gaylord, MI  49735
989-732-2912    paul@gaylordlaw.com



STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OTSEGO

STEPHEN SPENCE, on behalf of
himself and a class of all others
similarly situated,

                Plaintiffs,

   vs

GC SERVICES LIMITED PARTNERSHIP,
A Delaware limited partnership

and

SHEILA M. FEWS, an individual,

                Defendants.

_____/

File No: 18- )-7462 -CZ

Hon.
      Colin G. Hunter
        P-71821

TRUE COPY

OCT 09 2018

OTSEGO COUNTY CLERK

LAWRENCE A. FRIEDMAN    (P36935)
Attorney for Plaintiff
Post Office Box 609
Grayling, MI 49738
317-501-4671
*lfriedman@friedmanpartners.net*

WM PAUL SLOUGH    (P70489)
Co-Counsel for Plaintiff
145 North Otsego Avenue
Gaylord, MI 49735
989-732-2912
*paul@gaylordlaw.com*

_____/

## CLASS ACTION COMPLAINT

There is no other civil action between these parties arising
out of the same transaction or occurrence as alleged in
the complaint pending in this court nor has any such
action been previously filed and dismissed or transferred
after having been assigned to a judge.

1

**NOW COMES** the above-named Plaintiff, by and through his attorneys, Kirkpatrick & DuBois, and for his Complaint against the above-named Defendants, state as follows:

## Jurisdiction and Venue

1.  Plaintiff Stephen Spence is a resident of Antrim County, Michigan, and brings this action on behalf of himself and all others similarly situated throughout the State of Michigan.

2.  Defendant GC Services Limited Partnership ("GC Services") is a limited Delaware partnership who regularly conducts business throughout the State of Michigan, including Otsego County, with a primary office at 6330 Gulfton, Houston, TX 77081, and resident agent The Corporation Company, 30600 Telegraph Road, Bingham Farms, MI 48025.

3.  Defendant Sheila M. Fews is an individual who resides in Lansing, Michigan, and is licensed under Article 9 of the Michigan Occupational Code and who conducts business in Ingham County, Michigan, Agency License No. 2401002937, Manager License No. 2402001187.

4.  GC Services independently contracts with the State of Michigan to collect over 300 types of delinquent tax and state agency obligations including, but not limited to, sales, use and withholding taxes, individual income taxes, driver responsibility fees, welfare overpayments, and district court costs, fines and fees ("the Contract"). In FY 2017 alone, GC Services collected nearly $170 million in Tax and Non Tax obligations and was paid nearly $30 million in commissions.

5.  This lawsuit is a proposed class action against Defendants for violations of Article 9 of the Michigan Occupational Code, MCL 339.901 *et seq,* ( "Article 9"), and for breach of the Contract as a third-party beneficiary, which requires GC Services to maintain compliance with the Fair Debt Collection Practice Act, 15 USC § 1601, *et seq* ("FDCPA").

2

6.  Defendants have sent letters, statements, and other correspondence to persons and entities demanding payment on obligations ostensibly owed to the State of Michigan (the "demand letters").

7.  Plaintiff seeks to represent all persons and entities who, in the six years prior to the filing of this complaint, have received one or more demand letters from Defendants ("the Class").

8.  As set forth in this complaint, Defendants' demand letters sent to the Class violate Article 9 by using printed forms of a government agency or instrumentality, and by operating under a name or in a manner that implies or states that Defendants are a branch of, or associated with, or has been approved or licensed by, the Michigan Department of Treasury.

9.  As further set forth in this complaint, GC Services has breached the Contract with the content of its demand letters and with GC Services' other conduct, and members of the Class, as third-party beneficiaries of the Contract, have suffered damage as a direct and proximate result of GC Services' breach.

10. Plaintiff is a sole proprietor who received one of Defendants' demand letters, and is a member of the Class. *Exhibit 1 – Sample Demand Letter dated February 20, 2018.*

11. Plaintiff seeks damages, inclusive of attorney fees and costs, in an amount exceeding $25,000.00.

12. Jurisdiction and venue are proper in this court.

### Count I – Violation of Article 9 of
### the Michigan Occupational Code

13. Plaintiff incorporates all the preceding paragraphs by reference.

14. In its demand letters, GC Services describes itself as "a private debt collection company... authorized to collect delinquent liabilities owed to the state." *Exhibit 1*.

15. Under Article 9, a "collection agency" is an individual who, in the course of collecting or attempting to collect, represents himself or herself as a collection agency.

16. GC Services is licensed "collection agency" under Article 9, holding multiple Michigan licenses, including one by non-owner manager Defendant Sheila M. Fews in Ingham County, Michigan, Agency License No. 2401002937, Manager License No. 2402001187.

17. GC Services' contract with the State of Michigan requires it to maintain an office in Ingham County, Michigan, and to be properly licensed under Article 9.

18. For these reasons, each Defendant is a "collection agency" under Article 9.

19. Further, each Defendant is a "licensee" as that term is used in Article 9.

20. Article 9 defines a "claim" and "debt" to mean an obligation made primarily for personal, family, or household purposes. A "debtor" is defined as an individual who owes or purportedly owes a claim or debt.

21. Most prohibited acts under Article 9 apply only to a "claim" or "debt," or apply only to communications with "debtors." This makes many protections under Article 9 unavailable to the Class, as obligations owed to the State of Michigan are not typically for personal, family, or household purposes.

22. However, Article 9 contains blanket prohibition against certain activities regardless of whether the activity is related to obligations made primarily for personal, family, or household obligation.

23. Specifically, as a licensed private collection agency under Article 9, each Defendant is prohibited from:

    a.    Using printed forms of a government agency or instrumentality. MCL 339.915(c).

    b.      Operating under a name or in a manner that implies or states that the collection agency is a branch of, or associated with, or has been approved or licensed by, a department of federal, state, or local government. 339.915a(p).

24.    Neither of these prohibitions are limited to the collection of a "claim" or "debt" and apply generally to all licensees under the plain language of the statute.

25.    As part of Defendants' demand letters, Defendants enclose a Liability Information Statement containing a payment voucher in the footer area. The payment voucher is an official printed Michigan Department of Treasury Form No. 3480.

26.    Defendants' use of the Michigan Department of Treasury form, even if done so with the implied or express permission of the Michigan Department of Treasury, is a violation of MCL 339.915(c), which broadly prohibits the use of any printed forms of a government agency by a licensee.

27.    The Michigan Department of Treasury cannot authorize Defendants to violate MCL 339.915(c).

28.    Further, Defendants are operating under a name or in a manner that implies or states that GC Services is a branch of, or associated with, or has been approved or licensed by, the Michigan Department of Treasury, specifically:

    a.      Designating itself as the "Michigan Accounts Receivable Collection System";

    b.      Referring to itself as the "Office of Collections";

    c.      Using an official State of Michigan website link in the footer of its demand letters;

    d.      Attaching an official Michigan Department of Treasury form to its demand letters;

    e.      Stating that its agents are "representatives of the Michigan Department of Treasury and authorized to collect delinquent liabilities owed to the state."

    f.      Displaying its address and phone number next to official Michigan Department of Treasury website addresses and forms.

29. Defendants' act of operating in this manner, even if done so with the implied or express permission of the Michigan Department of Treasury, is a violation of MCL 339.915a(1)(p), which broadly prohibits this activity by a licensee.

30. The Michigan Department of Treasury cannot authorize Defendant to violate MCL 339.915a(1)(p).

31. The Michigan Legislature's restrictions on licensees in Article 9, as set forth above, are intended to prevent confusion and to protect the integrity of local, state, and federal collections.

32. Defendants' violations cause significant confusion in the Class; for example, an individual receiving one of Defendants' demand letters is provided a telephone number directly to Defendants' private collection agent, not to a civil servant of the State of Michigan.

33. An individual receiving one of Defendants' demand letters is left with the impression that a payment issued as directed is being sent directly to the State of Michigan, when it is in fact being sent to GC Services, a private collection agency.

34. Defendants have violated MCL 339.915(c) and MCL 339.915a(1)(p) by sending demand letters to members of the Class as set forth above.

35. Defendants' violation was willful.

36. Each person of the Class who suffers injury, loss, or damage, or from whom money was collect by the use of a method, act, or practice in violation of Article 9 may bring an action for damages or other equitable relief.

**WHEREFORE,** Plaintiff requests that this court enter an order certifying the Class, finding that Defendants' acts willfully violate MCL 339.915(c) and MCL 339.915a(1)(p), and awarding each member of the Class damages, together with reasonable attorney fees and court costs.

## Count II -- Breach of Contract

37.  Plaintiff incorporates all the preceding paragraphs by reference.

38.  GC Services provides collection services to the State of Michigan Department of Treasury under the Contract, in which GC Services makes express promises to the State of Michigan to collect monies and maintain specific standards. *Exhibit 2 – Statement of Work Terms and Conditions.*

39.  In the Contract, GC Services promises to "utilize a fair, consistent collection process that maintains compliance with the State and Federal Fair Debt Collection Practice Acts." *Exhibit 2 at 1.022(2)(f).*

40.  Additionally, GC Services promises the State of Michigan in the Contract that it will:

   a.  provide its personnel with "extensive training regarding the Fair Debt Collection Practices Act and the Consumer Credit Protection Act during new hire and ongoing training."

   b.  ensure every employee passes an FDCPA test with a score of 100% on a semi-annual basis; and

   c.  "full compliance" of its employees and that it will hold monthly prevention meetings specific to the FDCPA.

41.  In sum, GC Services promises in the Contract that it will implement and adhere to FDCPA standards in collecting debts from members of the Class.

42.  The elevated FDCPA standards imposed on GC Services in its collection practices through the Contract was directly intended to benefit members of the Class; that is, GC Services has contractually undertaken to give or to do or refrain from doing something directly to or for said members of the Class.

43.  For this reason, members of the Class, including Plaintiff, are third-party beneficiaries of the Contract under MCL 600.1405 and Michigan common law.

7

44.	GC Services has breached the Contract by failing to comply with FDCPA standards, including but not limited to:

a.	Failing to disclose in the initial written communication to members of the Class that the initial communication from GC Services is attempt to collect a debt and that any information obtained will be used for that purpose;

b.	Using language or symbol, other than the debt collector's address, on any envelope when communicating with a Class member by use of the mails;

c.	Using the business, company, or organization name other than the true name of the GC Services' business, company, or organization;

d.	Failing to include in the demand letter a statement that if the Class member notifies the debt collector in writing within a thirty-day period that the debt, or any portion thereof, is disputed, GC Services will obtain verification of the debt or a copy of such verification will be mailed to the Class member;

e.	Failing to actually stop collection and verify debts when verification of the debt was demanded by a members of the Class.

45.	Plaintiff, through his counsel, did demand from GC Services verification of an obligation ostensibly owed to the State of Michigan, to which GC Services refused to stop collection and provide written verification.

46.	As a direct result of GC Services' breaches of the Contract, members of the Class have suffered actual damages including but not limited to financial loss, lost time and opportunity, aggravation, and mental distress.

**WHEREFORE,** Plaintiff requests that this court enter an order certifying the Class; finding that members of the Class are third-party beneficiaries of the Contract under MCL 600.1405 and the common law; holding that the GC Services has breached the contract; and awarding each member of the Class damages arising from the breach; and award the members of the Class reasonable attorney fees and court costs.

Dated: 10/8/2016

WM PAUL SLOUGH                    (P70489)
Co-Counsel for Plaintiff
KIRKPATRICK DuBOIS & SLOUGH PLC
145 North Otsego Avenue
Gaylord, MI 49735
989-732-2912   *paul@gaylordlaw.com*

9

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OTSEGO

STEPHEN SPENCE, on behalf of
himself and a class of all others
similarly situated,

              Plaintiffs,

vs                             File No:  18-17462-CZ

GC SERVICES LIMITED PARTNERSHIP,      Hon. Colin G. Hunter
A Delaware limited partnership, and
SHEILA M. FEWS, an individual,

              Defendants.

_____/

LAWRENCE A. FRIEDMAN    (P36935)
Attorney for Plaintiff
Post Office Box 609
Grayling, MI  49738
317-501-4671
*lfriedman@friedmanpartners.net*

WM PAUL SLOUGH       (P70489)
Co-Counsel for Plaintiff
145 North Otsego Avenue
Gaylord, MI  49735
989-732-2912
*paul@gaylordlaw.com*

_____/

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR ENTRY OF PRELIMINARY INJUNCTION

      Defendant GC Services is a national collection agency based in Texas.  It holds a contract

with the State of Michigan Department of Treasury to collect delinquent tax and state agency

obligations including, but not limited to, sales, use and withholding taxes, individual income taxes,

driver responsibility fees, welfare overpayments, and district court costs, fines and fees.   In

exchange, it receives 10% of its collections.

When collection outstanding obligations, the Department of Treasury does so consistent with established practices and procedures as set forth in the Michigan Taxpayers Rights Handbook. *Exhibit 1.* As civil servants, employees of the Department of Treasury are subject to monitoring for compliance to ensure fair and courteous treatment for the public:

> Treasury has a system for monitoring compliance with the standards of fair and courteous treatment of the public which includes, but is not limited to, the ability of aggrieved persons to complain to the immediate supervisor of the individual who acts improperly, the ability of Treasury to discipline that person who acts improperly, and the ability of the Taxpayer Advocate to respond to complaints from the public.

> [. . .]

> Taxpayers have the right to information and help in complying with tax laws. In addition to the basic instructions that are provided with the tax forms, Treasury makes other information available online at www.michigan.gov/treasury or by phone at (517) 636-4486.

> [. . .]

> Individuals must treat taxpayers, their employees, and their representatives in a professional manner. Audit plans and actions must be fair and impartial.

*Michigan Taxpayers Rights Handbook*, p. 10-13. When a taxpayer calls the State of Michigan, it is reasonable to assume they will be treated according to these established guidelines.

It can be surmised that this is why the legislature strictly prohibits a licensed collection agency in Michigan from doing the following acts:

(1)  Using printed forms of a government agency or instrumentality. MCL 339.915(c).

(2)  Operating under a name or in a manner that implies or states that the collection agency is a branch of, or associated with, or has been approved or licensed by, a department of federal, state, or local government. 339.915a(p).

Without question, Defendants *are* contracting with the State of Michigan, as set forth in the complaint. However, as licensees under Article 9, they are bound by the statute's restrictions not to use printed forms or present themselves as an agency of the State of Michigan. The Department of Treasury cannot authorize Defendants to violate this strict prohibition in Article 9.

This is exactly what Defendants are doing. As clearly demonstrated by the collection notice attached to the Complaint as Exhibit 1, Defendants are:

(1)     Designating GC Services as the "Michigan Accounts Receivable Collection System";

(2)     Referring to GC Services as the "Office of Collections";

(3)     Using an official State of Michigan website link in the footer of demand letters;

(4)     Attaching an official Michigan Department of Treasury form to demand letters;

(5)     Stating that GC Services' agents are "representatives of the Michigan Department of Treasury and authorized to collect delinquent liabilities owed to the state."

(6)     Displaying its address and phone number next to official Michigan Department of Treasury website addresses and forms.

Any individual who receives the demand letter and calls the number in the letter would inadvertently reach GC Services, reasonably believing that he or she was calling a civil servant of the State of Michigan.

GC Services is no stranger to this deceptive tactic. In *Peter v Gc Servs. L.P.,* 310 F. 3d 344 (2002), attached as *Exhibit 2,* GC Services was sued in the Southern District of Texas for using the return address for the US Department of Education. The FDCPA generally forbids the use of any address or mark on an envelope that is anything other than the debt collector's address. GC Services argued to the district court that the obligations *were being collected for the US Department of Education,* and thus the representation was not misleading. The US Court of Appeals for the Fifth Circuit rejected GC Services' argument. The circuit court found that the plain language of the FDCPA forbid the activity:

> The district court concluded that this statutory provision was not violated because a sentence within the collection letter explained that the communication was sent by GC Services, as a government contractor. The language within the letter conflicts with the false impersonation conveyed by the envelope, **but it does not cancel or cure the envelope's departure from the strict mandate of that section**.

*Id.* at 352 (emphasis supplied).

GC Services is back to its old tricks. Plaintiff and other class members have received demand letters with GC Services' telephone number next to a Lansing PO Box and the Treasury's website link. This clearly deceives Class members into believing that the correspondence is from the Department of Treasury, and that the telephone number is to a civil servant at the Department of Treasury. Further, GC Services refers to itself as the "Office of Collections" thereby associating itself with the Michigan Department Treasury.

Even assuming, *arguendo,* that none of these representations are false or misleading, all of these acts nonetheless violate the strict prohibitions the legislature has set out in Article 9. Just as the court in *Peter, supra,* strictly enforced the FDCPA, this court should enforce the strict mandates of Article 9.

Further, members of the Class, including Plaintiff, are third-party beneficiaries, under both MCL 600.1405 and Michigan common law, of GC Services' contract with the State of Michigan. In that contract, GC Services promises that it will implement and adhere to FDCPA standards in collecting debts from members of the Class. To ensure this level of integrity, the Department of Treasury requires GC Services to:

(1) provide its personnel with "extensive training regarding the Fair Debt Collection Practices Act and the Consumer Credit Protection Act during new hire and ongoing training."

(2) ensure every employee passes an FDCPA test with a score of 100% on a semi-annual basis; and

(3) "full compliance" of its employees and that it will hold monthly prevention meetings specific to the FDCPA.

It also requires GC Services to "utilize a fair, consistent collection process that maintains compliance with the State and Federal Fair Debt Collection Practice Acts."

GC Services has breached the Contract by failing to utilize FDCPA standards, including but not limited to:

(1)     Failing to disclose in the initial written communication to members of the Class that the initial communication from GC Services is attempt to collect a debt and that any information obtained will be used for that purpose;

(2)     Using language or symbol, other than the debt collector's address, on any envelope when communicating with a Class member by use of the mails;

(3)     Using the business, company, or organization name other than the true name of the GC Services' business, company, or organization;

(4)     Failing to include in the demand letter a statement that if the Class member notifies the debt collector in writing within a thirty-day period that the debt, or any portion thereof, is disputed, GC Services will obtain verification of the debt or a copy of such verification will be mailed to the Class member;

(5)     Failing to actually stop collection and verify debts when verification of the debt was demanded by a members of the Class.

A plain reading of the demand letter attached to the complaint reveals all of the above violations.

Again, GC Services is no stranger to the FDCPA's requirements.  In *United States of America v GC Services Limited Partnership,* Southern District of Texas, Civil Action No. 17-461, attached as *Brief, Exhibit 3,* GC Services was sued by the Federal Trade Commission for FDCPA violations.  In resolution of those violations, GC Services agreed to be subject to a federal injunction against unlawful collection practices, including being enjoined from violating the FDCPA.  Further, the court imposed a specific requirement on GC Services, that it must place a "disclosure" in every correspondence to a consumer debtor indicating:

> Federal and state law prohibit certain methods of debt collection, and require that we treat you fairly.  If you have a complaint about the way we are collecting your debt, please visit our website at [applicable corporate website] or contact the FTC online at www.ftc.gov; by phone at 1-877-FTC-HELP; or by mail at 500 Pennsylvania Ave., NW, Washington, DC 20580.  If you want information about your rights when you are contacted by a debt collector, please contact the FTC online at www.ftc.gov.

No such disclosure exists in any correspondence with Plaintiff or any other Class Members.

For these reasons, a preliminary injunction under MCR 3.310 is appropriate in this case.  To avoid the above described violations, Defendants need only comply with Article 9 and the

FDCPA. As an experienced debt collector, this GC Services has the knowledge and resources to fully comply with both statutes with minimal effort during the pendency of this litigation. Simply revising their template demand letter language will avoid any violations. For that reason, Defendants will not be prejudiced by a preliminary injunction.

Plaintiff made a good faith attempt, without success, to reach an agreement to avoid litigation.

Plaintiff requests that this court enter a preliminary injunction through the pendency of this litigation. A proposed order is attached.

Dated: _10/25/18_

WM PAUL SLOUGH    (P70489)
Co-Counsel for Plaintiff

KIRKPATRICK DuBOIS & SLOUGH PLC
145 North Otsego Avenue
Gaylord, MI 49735
989-732-2912   *paul@gaylordlaw.com*